ZIMMERMAN | REED

December 20, 2023

Via ECF

MEMO

Mr. Jeffrey Landis
ZwillGen PLLC
1900 M Street NW, Suite 250
Washington, DC 20036

Re:   *Shapiro et al. v. Peacock TV LLC*, Case No. 7:23-cv-06345-KMK

Dear Mr. Landis,

This letter is in response to your letter dated December 13, 2023, in the above-mentioned matter and is pursuant to Rule II.A of the Court's Individual Rules of Practice. This letter responds to the arguments Peacock has identified as intending to make in its forthcoming motion to dismiss the First Amended Complaint ("FAC").

I.   Background

The FAC's basic factual allegations are straightforward and are assumed to be true for the purposes of resolving a motion to dismiss. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam). Peacock developed, owns, and operates a website, peacocktv.com ("Website"). FAC ¶¶ 2, 9, 15. The Website offers an array of video materials. *Id.* ¶ 2. Peacock monetizes its Website, in part, by collecting and disclosing subscriber information to Facebook. *Id.* ¶ 22. The Website uses a code analytics tool called "Facebook Pixel," which tracks the actions of subscribers, such as the pages or videos they view. *Id.* ¶¶ 23–24. When a Facebook account is created, a corresponding Facebook ID (or FID) number is also created. *Id.* ¶¶ 19–20. A user's Facebook profile can be identified and viewed by appending the user's Facebook ID number to the end of "Facebook.com." *Id.* ¶ 32.

If an individual watches a video trailer or clicks on a list of available videos while not logged into Peacock's Website but while logged in to Facebook on the same web browser and device, the individual's Facebook ID, the video material name, and a URL of the video the individual viewed "are simultaneously sent to Facebook via Facebook Pixel." *Id.* ¶¶ 25, 41, 61, 75, 89. The viewer's Facebook ID is sent to Facebook via a "cookie." *Id.* ¶¶ 31, 34. At the same

time, something called the "PageView" component of Facebook Pixel discloses to Facebook the video name and URL a viewer accessed. *Id.* ¶¶ 28-30. The FAC illustrates this process using the partially redacted Facebook ID of an unidentified user. *See id.* ¶ 27. If Facebook, Peacock, or perhaps someone else were to enter the video URL and the appended-Facebook-ID into a web browser, it would be possible to identify which Peacock video trailer or list of available videos a particular user had viewed. *Id.* ¶¶ 29–32.

Each Plaintiff subscribes to Peacock's Website. *Id.* ¶¶ 2, 52, 66, 80. To become a subscriber, each Plaintiff created an account by providing their name, address, phone number, and email address. Plaintiffs, as subscribers, were also charged a subscription fee. *Id.* ¶ 18. Each Plaintiff also has a Facebook account, "which he [or she] is perpetually logged into." *Id.* ¶¶ 58, 72, 86. To create a Facebook account, each Plaintiff must use the name they go by in everyday life, such that they can be personally identified by their Facebook account. *Id.* ¶ 20. Each Plaintiff's Facebook profile contains his or her name. *Id.* ¶¶ 59–60, 73–74, 87–88. Since becoming a Website subscriber, each Plaintiff has watched video trailers and has viewed lists of available videos while not logged into the Website but while logged into his or her Facebook account on the same web browser and device. *Id.* ¶¶ 55–56, 69–70, 83–84. Each time a Plaintiff watched video trailers and viewed lists of available videos while not logged into the Website, Peacock disclosed his or her Facebook ID, as well as the video name and the URL of the video trailer or list of available videos that he or she viewed to Facebook via Facebook Pixel. *Id.* ¶¶ 61–62, 75–76, 89–90. Peacock installed the Pixel on the Website knowing that it discloses personally identifiable information to Facebook. *Id.* ¶¶ 22–26. Plaintiffs allege that Peacock violated the Video Privacy Protection Act ("VPPA") each time it knowingly disclosed his or her Facebook ID and viewed-video-trailer-URLs and viewed-list-of-available-videos-URLs (and those of would-be class members) to Facebook via Facebook Pixel. *Id.* ¶¶ 4, 106–113.

2

Case 7:23-cv-06345-KMK   Document 17   Filed 12/27/23   Page 3 of 18
Case 7:23-cv-06345-KMK   Document 16   Filed 12/20/23   Page 3 of 18

December 20, 2023
Page 3

## II.  Discussion

### A.  History of the VPPA

In September 1987, Michael Dolan, a reporter for the *Washington City Paper*, learned that he and then-Supreme Court nominee Robert Bork used the same video store in Washington DC.[1] Hearing that Bork did not believe that the Constitution protected a person's privacy, Dolan had an idea. He told the clerk at the video store that he wanted to write about Bork's taste in movies and asked to see Bork's rental list. The clerk Xeroxed Bork's rental list of 146 VHS tapes and gave it to Dolan. With that list, Dolan published a story with a provocative title: *"The Bork Tapes – Never mind his writings on Roe vs. Wade. The inner workings of Robert Bork's mind are revealed by the videos he rents."*[2]

Dolan's thesis was that the "inner workings of Robert Bork's mind" could be revealed by the movies that drew the jurist's interest. "The only way to figure out what someone is like," Dolan stated, "is to examine what that someone likes—take a hard look at the tools of leisure he uses to chip away life's rough edges."

Dolan attempted to "figure out" Judge Bork through the movies he liked. For example, the fact that movie *The Private Life of Henry the Eighth* was on Judge Bork's list meant that "we might just have the closet royalist that Bork's critics are howling about" coming to the Supreme Court. *Pretty in Pink*'s spot on the list suggested that "Judge Bork likes his women…capable of private passion, however reserved they may be in public." Bork was also a fan of James Bond, as Dolan notes, "The Borks have rented five Bond films." However, the most startling movie on the list, to the reporter's eye, was the film *The Star Chamber*. In the film, a young Michael Douglas plays a judge who "wearies of the namby-pamby legal system that lets killers and rapists go free on technicalities." To remedy the situation "the jurist joins a secret society of colleagues who dish out

---

[1] Michael Dolan, *Borking Around*, THE NEW REPUBLIC (Dec. 19, 2012), https://newrepublic.com/article/111331/robert-bork-dead-video-rental-records-story-sparked-privacy-laws.
[2] *The Video Privacy Protection Act as a Model Intellectual Privacy Statute*, 131 HARV. L. REV. 1766, 1766 n.2 (2018), *available at* https://harvardlawreview.org/wp-content/uploads/2018/04/1766-1789_Online.pdf (citing Michael Dolan, *The Bork Tapes*, WASH. CITY PAPER (Sept. 25–Oct. 1, 1987), https://web.archive.org/web20160313041803/http://theamericanporch.com/bork5.htm [https://perma.cc/37V2T2ZD]).

Case 7:23-cv-06345-KMK   Document 16   Filed 12/20/23   Page 4 of 18
Case 7:23-cv-06345-KMK   Document 17   Filed 12/27/23   Page 4 of 18

December 20, 2023
Page 4

vigilante justice." The presence of this movie on Bork's list, Dolan quipped, "[s]ort of gives one pause, doesn't it. I'd really like to know what Judge Bork thought—not so much of the movie, but of the idea. Wouldn't you?"

Reflecting on the corpus of Judge Bork's movie interests, Dolan constructed this image of the high court nominee: "If I were to draw a psychological profile of Bork the viewer, I'd say he thinks of himself as a smooth operator who sticks to the beaten track but also has a secret wild life. He identifies with risk-takers and outsiders – but only the dapper sort who can doff their commando suits, slip into evening wear, and waltz with the duchess after stealing her jewels."

While it is unknown how many people read "*The Bork Tapes*" article, Dolan's piece caught the attention of a very influential group of people: Congress. Democrats and Republicans joined in their disgust over the article and put together a law—the VPPA—to prevent what happened to Judge Bork from happening to others.

As a result of Dolan's "*The Bork Tapes*" article, Congress passed the VPPA in 1988. *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 278 (3d Cir. 2016). The VPPA has been widely acknowledged to have been designed "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Braun v. Phila. Inquirer, LLC*, No. 22-CV-4185, 2023 WL 7544160, at *3 (E.D. Pa. Nov. 13, 2023) (quoting S. Rep. 100-599, at 1 (1988)). The remarks of Senator Simon, made at the time of the bill's passage, perhaps best reveals what is at the heart of the VPPA: protecting the privacy of the "records [which] are a window into our loves, likes, and dislikes." S. Rep. 100-599, at 6–7 (1988).

Many things have changed in the 35 years since the VPPA was passed. Video streaming services have replaced video stores. Facebook has supplanted local newspapers. But the VPPA remains.

C.  The VPPA

The VPPA states that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be

4

liable to the aggrieved person[ ]." 18 U.S.C. § 2710(b)(1).

1. Video Tape Service Provider ("VTSP")

VTSP means "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). A VTSP includes a website that provides video content. *See Sellers v. Bleacher Rep., Inc.*, No. 23-CV-00368-SI, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023).

2. Consumer

"Consumer" means "any renter, purchaser, or subscriber of goods or services from a VTSP." 18 U.S.C. § 2710(a)(1). A "subscriber" "requires some sort of ongoing commitment or relationship between the user and the entity." *Jackson v. Fandom, Inc.*, No. 22-cv-04423, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023). "Relevant considerations include whether the relationship between the plaintiff and the [VTSP] involves payment, registration, establishment of an account, provision of personal information, receipt or delivery of goods or services, expressed association, and/or access to restricted content." *M. K. v. Google LLC*, No. 21-CV-08465, 2023 WL 4937287, at *4 (N.D. Cal. Aug. 1, 2023). However, "[n]o single factor is dispositive." *Harris v. Pub. Broad. Serv.*, No. 1:22-CV-2456-MLB, 2023 WL 2583118, at *2 (N.D. Ga. Mar. 20, 2023).

3. Personally Identifiable Information ("PII")

PII "includes information which identifies a person as having requested or obtained specific video materials or services from a [VTSP]." 18 U.S.C. § 2710(a)(3). "For there to be an actionable VPPA violation, the [VTSP] must have knowingly disclosed: 1) a consumer's identity; 2) the identity of 'specific video materials'; and 3) the fact that the person identified 'requested or obtained' that material." *Feldman v. Star Tribune Media Co. LLC*, 659 F. Supp. 3d 1006, 2023 WL 2388381, at * 8 (D. Minn. 2023).

a. Consumer's Identity

With regard to a consumer's identity, most courts have found at the pleading stage that a Facebook ID identifies a consumer. *See Jackson v. Fandom, Inc.*, No. 22-CV-04423-JST, 2023

5

Case 7:23-cv-06345-KMK Document 16 Filed 12/20/23 Page 6 of 18
Case 7:23-cv-06345-KMK Document 17 Filed 12/27/23 Page 6 of 18

December 20, 2023
Page 6

WL 4670285, at *5 (N.D. Cal. July 20, 2023) (stating that the Facebook ID can readily be used by the average person to access a consumer's Facebook page, which may contain substantial personal information); *Feldman*, 2023 WL 2388381, at *10 ( "[M]ost district courts that have address the use of Facebook Pixel specifically reached this same result on Rule 12(b)(6) motions.").

        b.     Video Material and Its Identity

With regard to video materials, courts have found that videos of any duration are video materials. *See Sellers*, 2023 WL 4850180, at *3 ("Bleacher Report's argument that the VPPA applies only to providers of full-length movies contradicts the plain language of the VPPA. The VPPA concerns providers of 'prerecorded video cassette tapes or similar audio visual materials' with no stated restriction as to length.").

Courts have also found that lists of videos that a consumer shows interest in are video materials. *See Feldman*, 2023 WL 2388381, at *9 (stating that "a list that might have been produced by a video-rental store in 1987" shows the disclosure of PII); *see also Golden v. NBCUniversal Media, LLC*, No. 22 CIV. 9858 (PAE), 2023 WL 5434378, at *7 (S.D.N.Y. Aug. 23, 2023) ("But NBCU has not identified any statutory text or case authority making liability turn on whether the plaintiff whose video access was disclosed had actually watched the video(s) at issue. It would be surprising if the VPPA required such for liability. The statute, after all, was prompted by disclosure of the list of videos Judge Bork rented—not those he had viewed. *Cf.* S. Rep. 100–599, at 2 (1988) (VPPA purpose was 'extend privacy protection to *records* that contain information about individuals').").

With regard to identifying specific video materials, courts have found that video materials may be identified by the video's name and the URL where the video is located. *See, e.g., Jackson*, 2023 WL 4670285, at *5 (finding that disclosure of "the full name of each video" was sufficient to identify the video material); *Sellers*, 2023 WL 4850180, at *3 (finding "sufficient at the pleading stage" an allegation identifying the video material by the "name of the video" or "the URL" where the video is located); *Harris*, 2023 WL 2583118, at *6 (same); *Adams v. Am.'s Test Kitchen, LP*,

6

No. 22-CV-11309-AK, 2023 WL 4304675, at *6 (D. Mass. June 30, 2023) (finding sufficient an allegation identifying the video material by "the title of the video appears in the URL" and noting that "a simple visit to the URL would provide any third party who receives the information confirmation of the specific video requested or obtained").

### c. Requesting or Obtaining

Finally, with regard to showing that the person identified "requested or obtained" the video material, there is a distinction between "requesting" and "obtaining." "To 'request' something is to actively seek it out." *Sellers*, 2023 WL 4850180, at *4. "[T]o 'obtain' something is to gain it." *Id.* One may "seek" something but not "gain" it. *Id.* One may "gain" something but not "seek" it. *Id.* Thus, the VPPA only requires an allegation that the subscriber either sought the video material or gained the video material.

Putting it all together, courts have found that plaintiffs have made actionable VPPA claims by alleging that a VTSP uses the Facebook Pixel to disclose to Facebook the name or URL of the video material requested or obtained together with the subscribers' Facebook ID. *See Braun*, 2023 WL 7544160, at *3–4; *Sellers*, 2023 WL 4850180, at *3; *Jackson*, 2023 WL 4670285, at *4–5; *Adams*, 2023 WL 4304675, at *6; *Harris*, 2023 WL 2583118, at *6; *Feldman*, 2023 WL 2388381, at *8–10.

### 3. Knowingly

The VPPA is violated only when prohibited disclosures are made "knowingly." 18 U.S.C. § 2710(b)(1). Courts have found it sufficient to allege that the VTSP deliberately installed the Facebook Pixel on its website knowing that it would disclose PII to Facebook. *See, e.g., Sellers*, 2023 WL 4850180, at *5; *Adams*, 2023 WL 4304675, at *7; *Harris*, 2023 WL 2583118, at *6–7; *Feldman*, 2023 WL 2388381, at *10.

### D. The FAC Adequately Pleads a VPPA Claim Against Peacock

Peacock argues that the FAC fails to state a claim in five ways: (1) Plaintiffs are not consumers when viewing public promotional trailers; (2) trailers for Peacock programming are

Case 7:23-cv-06345-KMK Document 17 Filed 12/27/23 Page 8 of 18
Case 7:23-cv-06345-KMK Document 16 Filed 12/20/23 Page 8 of 18

December 20, 2023
Page 8

advertisements not covered by the VPPA; (3) lists of available programming are not covered by the VPPA; (4) disclosure of a URL is not disclosure of specific video material; and (5) the FAC does not allege that Peacock knowingly disclosed specific video materials to Facebook. None of these arguments satisfy a motion to dismiss.

### 1. Plaintiffs Are Subscribers Even When Viewing Public Trailers

Peacock argues that Plaintiffs are not subscribers when they are not logged into their Website accounts viewing publicly available trailers that anyone can view. Peacock asserts that "Plaintiffs' subscriber status did not facilitate or allow them to view the videos they complain about." Peacock Letter § 1. In sum, Peacock contends that Plaintiffs must be logged into their accounts to make a VPPA claim.

There is no support for Peacock's contention that Plaintiffs must be logged into their accounts to make a VPPA claim. Plaintiffs sufficiently allege they are subscribers because they provided their names and email addresses to Peacock, paid a fee, and use Peacock's Website.[3] They are thus subscribers whether or not they are logged into their accounts. The login is Peacock's creation, not a creation of the VPPA. The fact that Peacock allows subscribers to view video materials while not logged in does not lessen the subscribers' protections under the VPPA.

The function of Peacock's login is much like a Blockbuster Card in 1988. Both the login and Blockbuster Card serve as a "key" or "gatekeeper" to certain video materials. Peacock allows a person to access full-length videos if that person has a login much like Blockbuster allowed a person to check out a VHS tape if that person had a Blockbuster Card. But a person is still a Peacock subscriber even if he forgets to login as much as he still would be a Blockbuster subscriber even if he forgot his Blockbuster Card.

Consider this hypothetical: Let's assume that Judge Bork had a Blockbuster Card and the Card identifies him as member of Blockbuster's subscription program, which allows him to check

---

[3] Peacock concedes that Plaintiffs are subscribers under the VPPA. Even if Peacock did not concede, Plaintiffs adequately allege they are subscribers by alleging they provided their names and email addresses to Peacock, paid a fee, and use Peacock's services. FAC ¶ 18; *see also Jackson*, 2023 WL 4670285, at *4; *M. K. v. Google*, 2023 WL 4937287, at *4; *Harris*, 2023 WL 2583118, at *2.

out up to ten VHS tapes with no late fees. Bork goes to his video store and brings a copy of *The Breakfast Club* to the checkout counter. The clerk asks Bork for his Blockbuster Card, but the Judge has left his Card at home. The clerk tells Bork that he cannot check out *The Breakfast Club* because company policy requires Bork to show his Card. Angered, Bork tells the clerk, "Don't you remember me? I've been here a million times. I'm Robert Bork." The clerk still does not allow Bork to check out the movie without his Card, but he agrees to hold the VHS tape at the checkout counter while Bork goes home to get his Card. Bork leaves the store to get his card. While waiting for Bork to return, the clerk faxes a note to Michael Dolan of the *Washington City Paper*, disclosing to Dolan that Bork has requested *The Breakfast Club*, as Bork brought the tape to the checkout counter. The clerk would surely be violating the VPPA, even though Bork has not yet obtained the movie. The clerk knew or should have known that Bork had a Blockbuster Card, and thus was a member of the subscription program, because Bork told the clerk his name. The clerk should have checked the subscriber list to verify that Bork had a Card before disclosing Bork's request for *The Breakfast Club* to Dolan, because the VPPA imposes a duty on VTSPs like Blockbuster to protect subscribers' PII. Even though Bork could not check out the VHS tape without his Card, the video store clerk is still prohibited by the VPPA from disclosing to Dolan the fact that Bork has requested *The Breakfast Club*.

  The same is true for Plaintiffs who are not logged into their Website account. Plaintiffs can view trailers and click on lists of available videos while not logged in, but they cannot "check out" the full-length videos. But that does not mean that they are not subscribers when they are viewing trailers and clicking on lists of available videos. Their viewing of trailers and clicking on video lists while not logged into the Website is just like Bork bringing a copy of *The Breakfast Club* to the checkout counter at Blockbuster: both actions are requests of specific video materials made by subscribers. The lack of a login or a Blockbuster Card does not mean that they are unprotected by the VPPA.

  Furthermore, in the hypothetical situation, the fact that people who do not have Blockbuster

9

Case 7:23-cv-06345-KMK  Document 16  Filed 12/20/23  Page 10 of 18
Case 7:23-cv-06345-KMK  Document 17  Filed 12/27/23  Page 10 of 18

December 20, 2023
Page 10

Cards could also bring a copy of *Pretty in Pink* to the checkout counter does not mean that Bork's same conduct is unprotected by the VPPA. The actions of non-Blockbuster Card holders would not diminish the protections granted to Bork by the VPPA. Similarly, while Peacock argues that Plaintiffs' actions while not logged in are no different than the actions of the general public, the fact that members of the general public without a Peacock login can also view trailers and click on available video lists does not diminish the protections granted to Plaintiffs by the VPPA.

Thus, viewed properly, the function of a login and the function of the Blockbuster Card is to identify a person's subscriber status, but it is not the subscriber status itself. As a means of subscriber identification, a login or Card may make it easier for VTSP to tell subscribers from non-subscribers, but the lack of a login or Card does not turn subscribers into non-subscribers. In both the Bork hypothetical and in Plaintiffs' case, the VTSP knows or should know that Bork and Plaintiffs are subscribers without the login or Card because the VTSP is told the subscriber's name. Bork verbally tells the clerk his name, and Plaintiffs' Facebook ID tells Peacock their name. Given the obligations imposed by the VPPA on VTSPs, the video store clerk and Peacock have a duty to check whether Bork and Plaintiffs are subscribers. The store clerk and Peacock cannot stick their heads in the sand and ignore who is making the request for video materials.

Nothing in the VPPA's text or in any decision Peacock cites requires Plaintiffs to be logged in to their Website account in order for the VPPA to apply. Peacock insists otherwise, arguing that Plaintiffs are not "subscribers" when viewing publicly available trailers. *See* Peacock Letter § 1. To support its position, Peacock cites three cases: *Salazar v. National Basketball Ass'n*, --- F. Supp. 3d ---, 2023 WL 5016968 (S.D.N.Y. Aug. 7, 2023); *Golden v. NBCUniversal Media, LLC*, No. 22 Civ. 9858, 2023 WL 543437 (S.D.N.Y. Aug. 23, 2023); and *Salazar v. Global*, No. 3:22-cv-00756, 2023 WL 4611819 (M.D. Tenn. July 18, 2023). These cases, however, do not support Peacock's position. Rather, these cases address whether a consumer who signed up only for email newsletters qualifies as a "subscriber" for purposes of the VPPA. *See, e.g., Nat'l Basketball Ass'n*, 2023 WL 5016968, at *7. In each case, the court determined that to be a "subscriber" under the VPPA, a

Case 7:23-cv-06345-KMK  Document 17  Filed 12/27/23  Page 11 of 18

December 20, 2023
Page 11

consumer must rent, purchase, or subscribe to audio visual materials, not just any product or service. *See id.* ("A consumer under the VPPA…consumes…audio visual materials, not just any products or services from a video tape services provider."); *Golden*, 2023 WL 543437, at *11 ("[T]o qualify as a consumer under the VPPA, a person must rent, purchase, or subscribe 'to audio visual materials, not just any products or services from a video tape service provider."); *Global*, 2023 WL 4611819, at *11–12 ("[T]he plaintiff's interaction with the website…has nothing to do with video content and is ill suited for a claim under the *Video* Privacy Protection Act. …The newsletter is…not audio visual content, which necessarily means that Plaintiff is not a 'subscriber' under the VPPA.").

The Plaintiffs' case is fundamentally different from all three of these cases. Here, Plaintiffs subscribe to the Website to access Peacock's audio visual materials and as such are "subscribers" of a VTSP. Furthermore, trailers, while publicly available, are directly related to the audio video content of Plaintiffs' subscriptions. Only with a Website subscription can a person access a full episode of the show or movie portrayed in the trailers. Thus, unlike the plaintiffs in the cases cited by Peacock, Plaintiffs' viewing of public trailers enhances or affects their viewing experience of non-public full length videos—by viewing trailers, subscribers may decide to watch (or not) the full film. *See, cf., Global*, 2023 WL 4611819, at *11 (finding that, unlike Plaintiffs in this case, "the [plaintiffs'] complaint did not include facts that plausibly alleged that [the plaintiffs'] status as newsletter subscribers…enhanced or in any way affected their viewing experience") (cleaned up).

    2.    Trailers Are Video Materials Covered by the VPPA

Peacock argues that short video trailers are not covered by the VPPA because they are advertisements. However, there is no authority supporting Peacock's argument. On the contrary, courts have found that videos of any length are video materials under the VPPA. *Sellers*, 2023 WL 4850180, at *3 ("The VPPA concerns providers of 'prerecorded video cassette tapes or similar audio visual materials' with no stated restriction as to length.").

In addition, there is nothing in the text of the VPPA that removes video advertisements from the definition of "similar audio visual materials." Peacock cites *Tapestry* and *General Mills* in support of its argument, but neither case holds that video advertisements are not covered by the VPPA. Rather, in each case, the court found that the defendant was not a VTSP because the delivery of videos was too "ancillary" to its business (one defendant sold handbags and the other sold cereal). *See Cantu v. Tapestry, Inc.*, No. 22-cv-1974, 2023 WL 6451109, at *4 (S.D. Cal. Oct. 3, 2023); *Carroll v. Gen. Mills, Inc.*, No. 23-cv-1746, 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023).

Peacock asserts that it "has the same need to advertise" as any other business, and it "cannot be" that General Mills's video advertisements are allowed while Peacock's video trailers are not. *See* Peacock Letter § 2. But the VPPA does not forbid Peacock from advertising any more than it allows General Mills to advertise. The VPPA forbids VTSPs from disclosing their subscribers' PII. Peacock ignores the crucial difference between Peacock and General Mills in the eyes of the VPPA: Peacock is a VTSP and General Mills is not. The VPPA does not prohibit Peacock's video advertising, but it does create a duty upon Peacock to not disclose its subscribers' PII unlike General Mills, who is not a VTSP.

    3.    <u>Lists of Available Videos Are Specific Video Materials Covered by the VPPA</u>

Peacock argues that the disclosure to Facebook that Plaintiffs click on lists of specific episodes is not covered by the VPPA. Peacock states that "a list of videos (*i.e.*, the episodes of *Longmire* you can watch) is no more specific than a sandwich menu is a specific sandwich. Put another way not anything and everything relating to video materials are specific video materials." Peacock Letter § 3.

Peacock's argument is without merit. The reference to *Longmire* is specific: It tells Facebook the name of the show and reveals that the subscriber has requested that show and is interested in its genre. To use Peacock's analogy, the list featuring *Longmire* episodes is a specific

12

indication that the subscriber is interested in the "American neo-Western-crime-drama"[4] type sandwiches and not pizza. It may be a different case if the list simply said "drama," but in this case the list names a specific show series. Consider that Dolan reported that "The Borks have rented five Bond films." Dolan did not name all five Bond films, but an average person would have a fairly good idea of what Bork was interested in just by referencing the Bond movie series.

In addition, when Plaintiffs click on a list of available *Longmire* episodes, they are making a request for video materials. *See* FAC ¶ 29. Peacock then discloses Plaintiffs' identity (Facebook ID) and the name of the video episodes requested (*Longmire*) to Facebook via the Facebook Pixel. *See id.* ¶¶ 29–36. It does not make a difference under the VPPA that Plaintiffs could not obtain the full-length video of a *Longmire* episode while not logged in. *See Sellers*, 2023 WL 4850180, at *4 (distinguishing "request" from "obtain"). A list, after all, is a record of requests and the VPPA protects such records. *See Golden*, 2023 WL 5434378, at *7 ("The statute [VPPA], after all, was prompted by disclosure of the list of videos Judge Bork rented—not those he had viewed. *Cf.* S. Rep. 100–599, at 2 (1988) (VPPA purpose was 'extend privacy protection to records that contain information about individuals').").

Peacock's claim that a list of available videos on Peacock is no different from the "now playing" section of movie theater's website or the "movies' section of Best Buy." Peacock cites *Osheske* in support. However, Peacock's claims are meritless. A movie theater and Best Buy are not VTSPs, so the VPPA does not apply to them. *Osheske v. Silver Cinemas Acquisition Co.*, No. 22-cv-09463, 2023 WL 8188464, at *4 (C.D. Cal. Oct. 31, 2023) (finding that a movie theater is not a VTSP because "movie theaters do *sell*; but, they do not sell (or even rent) *audio visual materials*. When consumers purchase a movie ticket, they are purchasing a license to enter the theater premises at a particular time and, in effect, attend a public event").

### 4. Disclosure of a URL is Disclosure of Specific Video Materials

Peacock argues that "disclosing the URL does not reveal whether a website visitor

---

[4] *Longmire (TV Series)*, WIKIPEDIA, https://en.wikipedia.org/wiki/Longmire_(TV_series) (last visited Dec. 20, 2023).

requested or obtained specific video materials on that webpage because it does not indicate, among other things, whether the webpage contained video, if so, the name of the video, and whether the visitor requested or obtained any videos at all as opposed to merely reading an article on the page." Peacock Letter § 4. Peacock relies on *Martin v. Meredith*, 657 F. Supp. 3d 277, 284 (S.D.N.Y. 2023) for its argument.

*Martin* does not help Peacock. In *Martin*, the court found that URLs to the defendant's website were inadequate to disclose that the webpage included a video. *Martin*, 657 F. Supp. 3d at 284 ("[S]imply disclosing the name of a webpage and an associated Facebook ID leaves off essential information for a VPPA claim, including at least: (1) whether the webpage contains a video....").

However, *Martin* is an outlier and there are numerous cases to the contrary finding that "electronic disclosures of a person's video-viewing history, even if not explicit, can violate the VPPA." *Ghanaat v. Numerade Labs, Inc.*, No. 4:23-CV-00833-YGR, 2023 WL 5738391, at *4 (N.D. Cal. Aug. 28, 2023); *Feldman*, 2023 WL 2388381 at *10 (collecting cases finding same); *see also Lamb v. Forbes Media LLC*, No. 22-CV-06319-ALC, 2023 WL 6318033, at *10 (S.D.N.Y. Sept. 28, 2023) ("Defendant relies on *Martin v. Meredith Corp.*, but this case is distinguishable. In that case, the complaint generally alleged that the defendant 'caus[ed] the ... titles of the videos viewed to be shared with Facebook,' but its other allegations 'reveal[ed]' 'that the information disclosed d[id] not actually include the title of a video,' but only the name of the webpage visited. The court in *Martin* found a failure to allege PII as statutorily defined, holding 'simply disclosing the name of a webpage and an associated Facebook ID leaves off essential information for a VPPA claim.' Here, however, Plaintiffs allege that Defendant discloses 'the URL and whether the webpage features a video.'"); *Sellers*, 2023 WL 4850180, at *3 ("Bleacher Report's assertion that plaintiff must name the videos he obtained relies entirely on *Martin v. Meredith Corp.* The plaintiff in that case alleged that the website People.com employed a Facebook pixel to send 'the Facebook ID and the name of the webpage that a user accessed.' The

December 20, 2023
Page 15

court dismissed the claim because the alleged disclosure was limited to the name of a webpage that may contain a video, not the name of the video itself. Here, however, plaintiff alleges that Bleacher Report uses the Facebook pixel to disclose 'the content name of the video the digital subscriber watched, the URL, and the digital subscribers' FID.' This is sufficient at the pleadings stage."); *Golden*, 2023 WL 5434378, at *7 (rejecting NBCU's reliance on *Martin*, and stating, "NBCU's argument is unpersuasive, for at least two reasons. First, the VPPA permits disclosure of PII 'to any person if the disclosure is solely of the names and addresses of consumers and if ... [it] does not identify the title, description, *or subject matter* of any ... audio visual material.' 18 U.S.C. § 2610(2)(d)(ii) (emphasis added). Here, regardless whether the "title" of the viewed videos were disclosed, the FAC plausibly alleges that the disclosure of the URL identifies the subject matter of the viewed video. Second, as the case law above overwhelmingly holds, a complaint need not allege the disclosure of specific video titles; rather, the disclosure together of the user's Facebook IDs and the URLs of the videos the user accessed suffices.").

Like the plaintiffs in *Ghanaat, Feldman, Lamb, Sellers,* and *Golden*, Plaintiffs sufficiently allege that Peacock uses the Facebook Pixel to disclose the name of the video, the URL, and the subscribers' Facebook ID. *See* FAC ¶¶ 28–31, 34, 41, 61–62, 75–76, 89–90, 108–109.

In any event, however, "[w]hether a URL sufficiently identifies a video is ultimately a factual question that should not be resolved on motion to dismiss." *Ghanaat*, 2023 WL 5738391, at *4; *see Harris*, 2023 WL 2583118, at *6 ("Defendant is making a fact-based argument against application of the VPPA. Even if the Court could take judicial notice of the complete URL (as Defendant requests) or Defendant's website and resulting hyperlinks (as Defendant and Plaintiff both request), the Court could not interpret those facts to resolve the parties' factual disputes. Whether the URL code includes the information Plaintiff alleges, whether the embedded code accesses both a video and a written description, and whether the code indicates that someone has already watched a video are all conclusions from evidence far beyond the scope of proper judicial notice. To decide whether Defendant's use of the Facebook pixel violates the VPPA, the Court

15

Case 7:23-cv-06345-KMK Document 17 Filed 12/27/23 Page 16 of 18
Case 7:23-cv-06345-KMK Document 16 Filed 12/20/23 Page 16 of 18

December 20, 2023
Page 16

may have to resolve these questions. But those answers should follow discovery—when the Court will know what actually happened—rather than at the motion to dismiss stage—when the Court is being asked to locate additional facts and decide between the parties' competing interpretations of the evidence. For now, the Court accepts Plaintiff's allegation that Defendant 'sends the content name of the video the digital subscriber watched, the URL, and the digital subscriber's FID to Facebook.' This plainly alleges the information Defendant transmits to Facebook identifies a video 'requested or obtained' by Plaintiff.").

### 5. The FAC Adequately Alleges Peacock Knowingly Disclosed Specific Video Materials to Facebook

Peacock argues that the FAC does not adequately allege that it knowingly disclosed Plaintiffs PII to Facebook because "Peacock could not know or have access to Plaintiffs FIDs—an identifier set by Facebook that resides in a cookie that Facebook places on users' browsers." Peacock Letter § 5. However, this exact argument has been rejected many times and courts have found allegations of "knowing" disclosure sufficient when the plaintiff alleges that the VTSP deliberately installed the Facebook Pixel on its website knowing that it would disclose PII to Facebook, as is alleged in this case. *See* FAC ¶¶ 22–26; *Sellers*, 2023 WL 4850180, at *5;[5] *Adams*,

---

[5] *Sellers*, 2023 WL 4850180, at *4 ("Defendant argues that the information alleged to have been disclosed to Facebook was transmitted by Facebook itself, not Bleacher Report, because it is Facebook who places the 'c_user; cookie on users' browsers. But the complaint alleges that Bleacher Report transmits the information to Facebook by incorporating the pixel into its website. The Court must take these factual allegations as true and draw all reasonable inferences in plaintiff's favor. Bleacher Report's argument is a factual dispute better suited to summary judgment or trial than a motion to dismiss.... The complaint alleges that Bleacher Report deliberately installed the Facebook pixel on its website. It further alleges that Bleacher Report did this in order to improve its targeted advertising and increase its revenue. These factual allegations are enough for the court to reasonably infer that defendant knowingly discloses personally identifying information.").

2023 WL 4304675, at *7;[6] *Harris*, 2023 WL 2583118, at *6–7;[7] *Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 315 (D. Mass. 2022);[8]; *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22-cv-6348, 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022).[9]

Peacock also argues that "when a user visits a public page in a non-logged in state and the Meta Pixel transmits information, Peacock has no way of knowing whether it is disclosing information of a 'subscriber'…or a casual viewer with no ongoing relationship with Peacock." Peacock Letter § 5. However, as discussed above, Peacock knows or should have known that Plaintiffs are subscribers because when Plaintiffs visit the Website in a non-logged in state they are identified by their Facebook ID.

---

[6] *Adams*, 2023 WL 4304675, at *7 ("As to whether Defendants 'knowingly disclosed' Adams' personally identifiable information, Adams alleges that Defendants 'chose to install' Pixel, a 'unique string of code businesses can embed on their website[s] allowing them to track consumers' actions and report the actions back to Facebook,' on their website, 'thus making the knowing choice to track subscribers' [personally identifiable information] and send it to Facebook.' Adams further alleges that Defendants programmed Pixel on its website '[t]o take advantage of advertising and information services offered by Facebook' and 'knowingly disclos[ed] subscribers' FIDs, together with the content they request or obtain, to Facebook.' Adams asserts that '[a]t all relevant times, Defendants knew that the Facebook Pixel disclosed [personally identifiable information] to Facebook,' as evidenced by the 'functionality of the Pixel, including that the Pixels' sharing of information with Facebook enabled Defendants' website to show targeted advertising to its digital subscribers based on the content those digital subscribers had requested or obtained on the website, including videos.' These allegations are sufficient to raise a plausible claim that Defendants "actually knew that [they were] disclosing: 1) a user's identity; 2) the identity of the video material; and 3) the connection between the two,' and that Facebook 'might read' the user data and video content together.") (cleaned up).

[7] *Harris*, 2023 WL 2583118, at *6–7 ("Defendant argues Plaintiff has not pleaded the required knowledge because she has not alleged Defendant knew Plaintiff had a Facebook account or that she was using a device onto which Facebook had deposited the c_user cookie. Though not affirmatively stated in the complaint, the Court infers from Plaintiff's other allegations that she asserts Defendant's knowledge of this fact. After all, she alleges the Facebook pixel can only transmit personally identifiable information when the c_user cookie is enabled and active, that is, when a user has it in his or her browser and then visits Defendant's website. And she alleges Defendant did this to her. The Court thus finds Plaintiff has adequately alleged knowledge. Plaintiff also alleges Defendant intentionally installed the Facebook pixel on the Pbs.org website to benefit from the transmission of users' personally identifiable information. If Defendant installed the Facebook pixel knowing it transmits that information, the knowledge element of the VPPA is satisfied.") (citing *Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 315 (D. Mass. 2022) (finding knowledge where plaintiff alleged "defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscriber's FID [and that] defendant knew that the Facebook pixel disclosed personal viewing information to Facebook.")).

[8] *Belozerov*, 646 F. Supp. 3d at 315 (finding knowledge where plaintiff alleged "defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscriber's FID [and that] defendant knew that the Facebook pixel disclosed personal viewing information to Facebook").

[9] *Czarnionka v*, 2022 WL 17069810, at *4 (finding sufficient allegation "defendant's disclosures were made knowingly, as [defendant] programmed the Facebook pixel into its website code, knowing that Facebook would receive video titles and the subscriber's FID when a subscriber watched a video").

December 20, 2023
Page 18

### III. Conclusion

For all of these reasons, the FAC adequately pleads a violation of the VPPA against Peacock and a motion to dismiss will fail.

The Court will hold a pre-motion conference on
1/ 24 /24, at 10:30
So Ordered.
*[signature]*
12/21/23

Sincerely,

/s/ Jeffrey J. Harrington
Jeffrey J. Harrington (*pro hac vice*)
ZIMMERMAN REED LLP
80 South 8th Street, Suite 1100
Minneapolis, MN 55402
T: (612) 341-0400
E: jeffrey.harrington@zimmreed.com

*Counsel for Plaintiffs*

cc: The Honorable Kenneth M. Karas (via ECF)

18