UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SCOTT SHAPIRO, *et al.*,

                              Plaintiffs,

        v.                                              No. 23-CV-6345 (KMK)

PEACOCK TV,                                             <u>OPINION & ORDER</u>

                              Defendant.


<u>Appearances</u>:

Caleb L. Marker, Esq.
Zimmerman Reed LLP
Los Angeles, CA
*Counsel for Plaintiffs*

Jeffrey Harrington, Esq.
Zimmerman Reed LLP
Minneapolis, MN
*Counsel for Plaintiffs*

Todd Seth Garber, Esq.
Finkelstein, Blankenship, Frei-Pearson & Garber, LLP
White Plains, NY
*Counsel for Plaintiffs*

Jibrael J.S. Hindi, Esq.
The Law Offices of Jibrael S. Hindi
Fort Lauderdale, FL
*Counsel for Plaintiffs*

Manuel S. Hiraldo, Esq.
Hiraldo P.A.
Fort Lauderdale, FL
*Counsel for Plaintiffs*

Michael Eisenband, Esq.
Eisenband Law, P.A.
Fort Lauderdale, FL
*Counsel for Plaintiffs*

Marc J. Zwillinger, Esq.
Jeffrey Landis, Esq.
ZwillGen PLLC
Washington, DC
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Plaintiffs Scott Shapiro ("Shapiro"), Corey Amundson ("Amundson"), Tanya Marshall ("Marshall"), Daniel Weiss ("Weiss"), and McKenzie Evans ("Evans") (collectively, "Plaintiffs") bring this Class Action against Defendant Peacock TV LLC ("Peacock" or "Defendant"), on behalf of themselves and similarly situated subscribers of Defendant, alleging that Defendant made disclosures in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA" or the "Act"). (*See generally* Consolidated Am. Compl. ("CAC") (Dkt. No. 28).)[1]

Before the Court is Defendant's Motion to Dismiss the CAC pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (*See generally* Not. of Mot. (Dkt. No. 33).) For the reasons that follow, Defendant's Motion is denied in part and granted in part.

## I. Background

### A. Factual Background

Unless otherwise stated, the following facts are drawn from Plaintiffs' CAC and are assumed true for the purpose of resolving the instant Motion. *See Buon v. Spindler*, 65 F.4th 64,

---

[1] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper right corner of each page.

69 n.1 (2d Cir. 2023) ("The factual summary below is derived from the allegations in the [complaint], which we must accept as true in reviewing a motion to dismiss".)

Defendant Peacock owns and operates Peacocktv.com ("the Website"). (CAC ¶ 11.) Peacock is a video streaming service that provides a number of pre-recorded audio-visual materials, including TV shows and movies, to subscribers and non-subscribers alike. (CAC ¶¶ 17–18, 43(a).) Defendant has over 20 million users who have the ability to request or obtain specific pre-recorded audio-visual materials or services from the Website. (*Id.* ¶ 19.)

The Website is accessible to anybody, but users can create an account by providing information such as "their name, address, phone number, and email address" as well as by "pay[ing] a fee." (*Id.*) Once users create an account, they can log into the Website to "view full episodes of specific prerecorded videos" that are only available to account-holders. (*Id.* ¶ 44.)

Each Plaintiff has a Facebook account. (*Id.* ¶¶ 61, 75, 89, 103, 117.) To create a Facebook account, individuals must provide their names "such that a person can be personally identified by their Facebook account." (*Id.* ¶ 21.) Once a Facebook account is created, a unique Facebook ID ("FID") is also created, which can be used to identify and view the associated Facebook profile. (*Id.* ¶¶ 22–23.) Plaintiffs allege that Defendant "monetizes" the Website, by collecting and "disclosing its subscribers' [personally identifiable information ("PII")] to Facebook, including data that identifies subscribers and the audio-visual materials (or services) they request or obtain." (*Id.* ¶ 24.) To do this, Defendant's Website uses a computer analytics tool called the "Facebook Pixel," also known as "Meta Pixel," which was installed at Defendant's discretion and which can be used to track the actions and the FID of Website visitors, including Website account holders. (*Id.* ¶¶ 25–35.) By using this process, Plaintiffs allege that Defendant can learn and share the specific video materials and/or services requested

by a specific individual. (*Id.* ¶ 36.) Plaintiffs further allege that Defendant knew this information would be disclosed by those accessing the Website and that Defendant did not obtain the consent of Website subscribers to disclose their PII. (*Id.* ¶¶ 37–39.)

Based on these alleged practices, Plaintiffs claim that Defendant is violating the VPPA by disclosing PII to Facebook without authorization when subscribers who are not logged into their Peacock accounts: (i) "view pages on the Website with trailers for specific pre-recorded videos," and/or (ii) "view pages on the Website with lists of episodes for specific pre-recorded videos." (*Id.* ¶ 43.) According to Plaintiffs, even while logged out, Peacock identifies subscribers by using a "mid" ID cookie.[2] (*Id.* ¶ 43(h).) Plaintiffs allege that the Pixel transmitted the URLs of the trailers and episode lists that they viewed to Facebook, along with their FIDs, without their consent. (CAC ¶¶ 39–40, 43.)

B. Procedural History

Plaintiffs filed the initial Complaint on July 21, 2023, (*see* Compl. (Dkt. No. 1)), their Amended Complaint on November 16, 2023, (*see* Am. Compl. (Dkt. No. 8)), and their Consolidated Amended Complaint on March 1, 2024, (*see* CAC). The Parties filed their respective pre-motion letters on December 13, 2023 and December 20, 2023. (*See* Dkt. Nos. 14,

---

[2] Defendant contends that this fact has been insufficiently alleged, arguing that the "Complaint pleads no facts showing what a 'mid' cookie is or that it exists on any website, much less that Peacock used it." (Def. Rep. Mem. of Law in Supp. of Mot. to Dismiss ("Def. Rep.") 14 (Dkt. No. 37).) Plaintiffs have alleged that "Defendant tracks Website visitors" with the mid cookie, implying both that Peacock uses the cookie and that it is installed on the Website. (CAC ¶ 43(h).) At this stage in the litigation, the Court will take all the Plaintiff's factual allegations as true. *See Williams v. Richardson*, 425 F. Supp. 3d 190, 200 (S.D.N.Y. 2019) ("In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.") Plaintiffs were not required to explain the functionality of a mid-cookie to meet their burden.

16.)  On April 3, 2024, the Court held a conference to discuss the pre-motion letters, and set a briefing schedule.  (*See generally* Dkt.)

Defendant filed its Motion to Dismiss and accompanying Memoranda of Law on May 10, 2024.  (Not. of Mot.; Mot. Mem. of Law in Supp. of Mot.  ("Def. Mem.") (Dkt. No. 34); Decl. of Jeffery Landis ("Landis Decl.") (Dkt. No. 35).)  Plaintiffs filed their Opposition on June 14, 2024.  (Pls. Opp. to Def. Mot. ("Pls. Opp.") (Dkt. No. 36).)  Defendant filed its Reply on July 3, 2024.  (Def. Rep. to Pls. Opp. ("Def. Rep.") (Dkt. No. 37).)

Defendant filed a letter providing supplemental authority in support of the Motion on September 16, 2024.  (Dkt. No. 38.)  Plaintiffs responded on October 16, 2024.  (Dkt. No. 39.) At the Court's invitation, (*see* Dkt. No. 40), the Parties submitted supplemental briefing in light of the Second Circuit's decision in *Salazar v. National Basketball Association*, 118 F.4th 533 (2d Cir. 2024), (*see* Dkt. Nos. 41, 42).  On December 5, 2024, Plaintiffs filed a letter providing the Court with additional supplemental authority.  (*See* Dkt. No. 43.)  On March 12, 2025, Plaintiffs filed a letter alerting the Court to *additional* supplemental authority, (*see* Dkt. No. 44), and on March 13, 2025, Defendant responded, (*see* Dkt. No. 45).  Plaintiff replied to Defendant's response on March 18, 2025.  (*See* Dkt. No. 46.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted).  Indeed, Rule 8 of the

Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted) (internal quotation marks and citation omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a

district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

### B.  Analysis

In the CAC, Plaintiffs allege that Defendant violated the VPPA by disclosing their personal information to a third party, Facebook, without their consent.  (*See* CAC ¶¶ 135–143.)

The VPPA was enacted in 1988, in response to a newspaper article which published then-judicial nominee Robert Bork's video rental history.  *See* S. REP. NO. 100-599 at 5 (1988) ("The impetus for this legislation occurred when a weekly newspaper in Washington published a profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store."); *see also Salazar,* 118 F.4th at 544–55 (discussing the genesis of the VPPA and noting that the article entitled "*The Bork Tapes*" "was the catalyst for the VPPA"); *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 96–97 (S.D.N.Y. 2023) (same).  The VPPA creates a private right of action, providing, as relevant here, that a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person . . . ."  18 U.S.C. § 2710(b)(1); *see also In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278–79 (3d Cir. 2016) (noting that the VPPA provides private right of action for those found to have been victims of unlawful disclosure of PII under the statute).  Some have noted that the law is "not well drafted."  *Id.* (citing *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 538 (7th Cir. 2012)).

To establish a violation of the VPPA, Plaintiffs must make sufficient factual allegations to plausibly allege that Defendant (1) was a video tape service provider, which, (2) knowingly disclosed Plaintiffs' PII, and that (3) Plaintiffs are subscribers within the meaning of the Act. *See Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 156–62 (S.D.N.Y. 2023) (relying on these elements for its VPPA analysis). A "video service provider" is defined as any person "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). A "consumer" is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). PII is defined to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). "In construing '[PII],' courts have found that a tape service provider must have disclosed information that 'at the very least, identif[ies] a *particular* person—not just an anonymous individual—and connect[s] this particular person with her or her viewing history." *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 286 (S.D.N.Y. 2024) (emphasis and alterations in original) (quoting *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015). Put another way, there are "three distinct elements in the PII definition: 'the consumer's identity; the video material's identity; and the connection between them.'" *Id.* (quoting *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015)).

In support of its Motion, Defendant argues that Plaintiffs' claims fail for four reasons. First, Defendant argues that Plaintiffs are not consumers within the meaning of the VPPA. (*See* Def. Mem. 16–23; Def. Rep. 6–10.) Second, Defendant argues that the information it disclosed (trailers and lists of episodes) does not fall within the meaning of "personally identifiable information" (PII). (*See* Def. Mem. 23–27; Def. Rep. 11–14.) Third, Defendant contends that

the information it disclosed did not amount to "specific video material."  (*See* Def. Mem. 27–29;

Def. Mem. 13–14.)  Fourth, Defendant argues that it did not "knowingly" disclose Plaintiffs'

information, because it was Facebook that collected the information.  (*See* Def. Mem. 29–32;

Def. Rep. 14–15.)  The Court addresses each argument in turn.[3]

       1.  "Consumers"

Defendant argues that Plaintiffs are not "subscribers" and therefore not "consumers"

within the meaning of the VPPA. (*See* Def. Mem. 16–23; Def. Rep. 6–10.)  Plaintiffs claim that

they are "subscribers" within the meaning of the Act because they created an account with

Defendant's website, entered their personal information into the website, and paid a fee.  (*See*

CAC ¶ 20.)  Defendant counters that while Plaintiffs may be subscribers in other contexts, they

are not subscribers when they view videos while logged out of their accounts, because at that

point there is no "nexus" between the alleged subscription and the disclosure at issue.  (*See* Def.

Mem. 16–21; Def. Rep. 7–8.)

The VPPA defines "consumer" as "any renter, purchaser, or *subscriber* of goods or

services from a video tape service provider."  18 U.S.C § 2710(a)(1) (emphasis added).

"'Subscriber' is not a separately defined term under the VPPA."  *Carter*, 670 F. Supp. at 97.

While courts in the Second Circuit have wrestled with the meaning of "subscriber," *see id*. 97–

98; *Golden*, 688 F. Supp. 164–65 (collecting cases); *Sutton v. TED Found., Inc.*, No. 23-CV-

9219, 2024 WL 4167342, at *5 (S.D.N.Y. Sept. 12, 2024), they have identified several factors to

determine whether a plaintiff qualifies as a "subscriber": (1) whether the plaintiff pays money for

---

[3] Because Defendant's second argument (disputing whether the materials at issue fall within the scope of "PII") and third argument (disputing the whether the materials at issue are "specific" within the meaning of the statute) substantially overlap, the Court addresses both arguments together.

the service at issue, (2) whether the plaintiff has registered an account with the defendant, (3) whether the plaintiff was expressly associated with the defendant, (4) whether the plaintiff has engaged in some commitment to the defendant, (5) whether the plaintiff has received access to restricted content as a result of their account status with the defendant. *See Sutton*, 2024 WL 4167342, at *5 (noting that "subscriptions involve some or most of the following factors: payment, registration, commitment, delivery, expressed association, and/or access to restricted content" (internal quotations omitted)); *Golden*, 688 F. Supp. 3d at 164 (using the same factor-based analysis); *Lamb v. Forbes Media LLC*, No. 22-CV-06319, 2023 WL 6318033 at *12 (S.D.N.Y. Sept. 28, 2023) (same).

However, Defendant argues that something beyond this factor-based analysis is required to show a plaintiff is a consumer under the VPPA: a nexus between a plaintiff's status as a subscriber and the alleged disclosure. (*See* Def. Mem. 16–21; Def. Rep. 7–8.) In support of this position, Defendant relies on several cases from courts in the Second Circuit, including *Carter*, which found that a subscriber to a business' non-video offerings is not a "consumer" within the meaning of the VPPA. (*See* Def. Mem. 17 (citing *Carter*, 670 F. Supp. at 98; *Lamb*, 2023 WL 6318033, at *12).) That is, even where a plaintiff subscribed to *some* offering provided by the defendant, that plaintiff could not be a "subscriber" within the meaning of the Act unless there was a nexus between their "subscription" and the VPPA violation.

The Second Circuit squarely addressed the meaning of "subscriber" in *Salazar*. There, the court held that the plaintiff had plausibly pled he was a "subscriber" within the meaning of the VPPA even though the plaintiff had simply signed up for an email newsletter provided by NBA.com. *See Salazar*, 118 F.4th at 550–553. In other words, the plaintiff was a subscriber under the VPPA notwithstanding the absence of a "nexus" between the email newsletter and the

video materials the Plaintiffs had viewed.  *See id.* at 538 ("There are presently no allegations in Salazar's complaint that he watched or accessed NBA.com videos through the online newsletter."); *see also Lee v. Springer Nature Am., Inc.*, No. 24-CV-4493, 2025 WL 692152, at *9 (S.D.N.Y. Mar. 4, 2025) ("[U]nder *Salazar*, a plaintiff need not plead that they paid separate consideration for access to the audio visual material.  It is sufficient that Plaintiff subscribed to the Website, which is a good or service provided by Defendant, and that Defendant is a video tape service provider.").

After *Salazar*, to fall within the definition of "consumer" in the VPPA, plaintiffs simply must show that they have *some* subscriber relationship with a website.  A "nexus" between the disclosure and the subscriber relationship is not required.  *Salazar*, 118 F.4th at 550–53 (concluding a subscriber relationship existed where the plaintiff had not alleged a nexus between his subscription and his viewership); *see also Lee*, 2025 WL 692152, at *9 (concluding the plaintiff was a "consumer" where the pleading suggested that they purchased a subscription and then accessed the videos on the website for free).  Thus, in light of *Salazar*, Defendant's initial argument challenging Plaintiffs' status as consumers falls flat.

### 2.  Personally Identifiable Information ("PII")

To make out a claim under the VPPA, Plaintiffs must allege that their "personally identifiable information" was disclosed.  18 U.S.C. § 2710(a)(3).  The statute defines "personally identifiable information" as including "information which identifies a person as having requested or obtained *specific video materials or services* from a video tape service provider."  *Id.* (emphasis added).  The allegations indicate that the information disclosed that Plaintiffs requested or accessed trailers and lists of episodes.  (*See* CAC ¶ 43.)  Defendant responds that neither trailers nor lists of episodes constitute "specific video materials."  (Def. Mem. 23–29.)

Therefore, the dispute between the Parties centers on what the term "specific video materials" encompasses.

a.   Trailers

Defendant argues that the VPPA does not cover trailers accessed by Plaintiffs on Peacocktv.com because trailers are "mere advertising," and not "specific video material" within the meaning of the statute.  (Def. Mem. 25.)  In support of this contention, Defendant relies entirely on out-of-circuit cases which it argues demonstrate that "[t]railers intended to market [] goods or services differ from the shows and movies themselves, and the VPPA does not apply to such trailers."  (*See id*.)

Far from standing for the proposition that a trailer may never be a "video material" within the meaning of the VPPA, these cases hold that simply carrying trailers on one's website does not convert the website's owner from a non-video tape service provider to a video-tape service provider ("VTSP").  *See, e.g., Lee,* 2025 WL 692152, at *8 (concluding that "[c]ourts have held that for the defendant to be engaged in the business of delivering video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose" and collecting cases (internal citations and quotation marks omitted)).

In *Cantu v. Tractor Supply Co.*, No. 23-CV-3027, 2024 WL 1601257 (C.D. Cal. Mar. 21, 2024), for example, the court rejected the plaintiff's contention that the website corporate.tractorsupply.com was a VTSP simply because the website carried a video featuring the "'inspirational' story" of the defendant's employees who recovered from cancer.  *Id*. at *4. The court in that case reasoned that the videos at issue were videos used by the defendant to raise

"'brand awareness' rather than as a 'particular field of endeavor,'" and therefore could not convert the defendant into a VTSP. *Id*.

Similarly, in *Hernandez v. Container Store, Inc.*, No. 23-CV-5067, 2024 WL 72657 (C.D. Cal. Jan. 3, 2024), the court determined that the defendant—The Container Store, Inc.— was not a VTSP simply because its website hosted video advertisements of its products. *See id*. at *2. Crucially, the court did not hold that the video advertisements could *never* qualify as "video material" within the meaning of the VPPA, but rather that the allegations did not suggest that the defendant was *in the business* of distributing these videos, and therefore could not qualify as a VTSP under the statute. *Id*. ("The [c]omplaint fails to allege how these 'videos used for marketing purposes' are central, rather than 'peripheral to Defendant's business.'").

*Cantu v. Tapestry, Inc.*, No. 22-CV-1974, 2023 WL 4440662 (S.D. Cal. July 10, 2023), and *Carroll v. General Mills, Inc.,* No. 23-CV-1746, 2023 WL 4361093 (C.D. Cal. June 26, 2023), follow the same line of reasoning. In *Tapestry, Inc*., the court held that the plaintiff had not alleged that Coach, a luxury fashion brand, was in the business of making and monetizing videos. *See Tapestry, Inc*., 2023 WL 4440662, at *8. The court determined that video advertisements were a "peripheral[]" part of Coach's business, and therefore that it could not be held liable as a VTSP. *See id*. Again, *Tapestry, Inc*. nowhere states that *advertising videos themselves* are per se exempt from coverage under the VPPA. *See generally id*. Similarly, in *Carroll*, the court nowhere held that an advertisement cannot be "video" for the purposes of the VPPA, but rather that General Mills was not converted to a VTSP simply by virtue of the fact that it "peripherally and passively" was involved in the creation of video content. *See Carroll*, 2023 WL 4361093, at *3. Therefore, none of these cases is on point here.

In the absence of guidance from other courts, the Court first turns to plain meaning of the term "video" in the statute. *In re Terrorist Attacks on Sept. 11, 2001*, 117 F.4th 13, 22 (2d Cir. 2024) ("When interpreting a statute, [the Court] necessarily begin[s] with the plain meaning of a law's text and, absent ambiguity, will generally end there." (citations and alterations omitted)). The Oxford English Dictionary defines the adjective "video" as a characteristic "[o]f, relating to, or concerned with the recording, reproduction, or broadcasting of *moving images* on magnetic tape or digitally." *Video (adjective)*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/3z9dpmrt [https://perma.cc/7EFX-WQQZ] (last visited March 24, 2025) (emphasis added).

The items described as "trailers" on the Website consist of moving images or recordings of images, consistent with this dictionary definition of "video." For example, the "trailer" for Peacock's show *Long Bright River* consists of a short series of moving images from the program. *See Long Bright River*, PEACOCK, https://tinyurl.com/ydjex7u6 [https://perma.cc/9YH6-M9PK] (last accessed March 24, 2025). Other pages have similar trailers. *See, e.g.*, *Yellowstone*, PEACOCK, https://tinyurl.com/242xx2sn [https://perma.cc/BW49-BZ5P] (last accessed March 24, 2025).[4] This analysis suggests that at the very least, "trailers" fall within the plain meaning of the term "video."

---

[4] A court may "take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Lee*, 2025 WL 692152, at *4 (quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015)); *see also Fernandez v. Zoni Language Centers, Inc.*, No. 15-CV-6066, 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016) ("Courts may also take judicial notice of information contained on websites where 'the authenticity of the site has not been questioned.'" (quoting *Hotel Emps. & Rest. Emps. Union, Loc. 100 of N.Y., N.Y. & Vicinity, AFL CIO v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002))), *aff'd*, 858 F.3d 45 (2d Cir. 2017)). Neither Party has disputed the authenticity of Peacocktv.com, nor could they, as both Parties rely on information from the site.

Consistent with this conclusion, courts have repeatedly found that even short, pre-recorded content can qualify as a "video" within the meaning of the statute. *See, e.g., Aldana v. GameStop, Inc.,* No. 22-CV-7063, 2024 WL 708589, *6 (S.D.N.Y. Feb. 21, 2024) (noting that "[c]ourts across the country have agreed that short, pre-recorded videos constitute 'similar audio visual material' under the VPPA" and collecting cases); *Lamb*, 2023 WL 6318033, at *1, 10–11 (concluding that "video clips" qualified as "specific video materials" under the VPPA). Applying these holdings and the plain meaning of "video" to this case, the Court concludes that the Website's trailers are "video materials" under the VPPA.  Indeed, the only difference between the short, pre-recorded videos at issue in prior cases and the videos before the Court-is that the trailers here primarily serve as advertisements.  However, as noted, there is nothing in the language of the VPPA that limits the definition of "video materials" to non-advertising content, and nothing in the text of the statute requires the Court to conclude otherwise.  *See Aldana,* 2024 WL 708589, at *6 (applying the VPPA to "cut-scenes" from video games); *Tapestry, Inc*., 2023 WL 4440662, at *6 ("The content of the webpage and video is irrelevant to the VPPA's non-disclosure requirement."); *Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 314 (D. Mass. 2022) (concluding that the VPPA is not "limited to audio visual materials of a certain *content*, medium or duration." (emphasis added)).

In arguing that the Court should rule that trailers are not "video materials" within the meaning of the statute, (*see* Def. Mem. 25–27), Defendant asks the Court to read a limitation into the statute that does not exist.  This Court will not do.  *See Hernandez v. Comm'r of Soc.*

---

(*See* CAC ¶ 31; Def. Mem. 13.)  Therefore, the Court finds reference to Peacocktv.com appropriate for the determination of the Motion.  *See Lee*, 2025 WL 692152, at *4–6 (taking judicial notice of defendant's website in a VPPA case).

*Sec.,* No. 21-CV-10658, 2022 WL 18402121, at \*13 (S.D.N.Y. Dec. 16, 2022) (declining to

"read words 'into a statute that do not appear on its face.'" (quoting *Bates v. United States*, 522

U.S. 23, 29 (1997))), *report and recommendation adopted*, 2023 WL 358780 (S.D.N.Y. Jan. 23,

2023); *United States v. Valle*, 467 F. Supp. 3d 194, 204 (S.D.N.Y. 2020) (concluding that a

particular reading of a statute was more persuasive because "it is true to the plain language of the

statute" and "Congress inserted no [limiting] language, and it is not [the c]ourt's role to read into

the statute critical language that the legislature chose not to employ").[5]

---

[5] To the extent that Defendant argues that the canon against constitutional avoidance compels a different conclusion here, the Court finds this argument unpersuasive.  Defendant argues that: "[m]arketing [] cannot be allowable under the VPPA if done by a non-video programming provider but prohibited if done by a video programming provider[,] because such a speaker-based restriction on speech would run afoul of the First Amendment."  (*See* Def. Mem. 26.)

First, Defendant misstates the law.  The VPPA does not "prohibit" marketing at all; instead, it limits the circumstances under which VTSPs may disclose sensitive information about those who qualify as subscribers.  *See* 31 U.S.C. § 2710(b).  The statute has nothing to say about the trailers Defendant decides to post on its Website—it simply circumscribes Defendant's ability to *share information* about who has viewed those trailers.

Second, while it is true that the statute does draw distinctions between speakers (i.e., VTSPs and non-VTSPs), this critique is applicable regardless of whether the Court holds that advertisements fall under the VPPA's ambit.  That is because speaker-based distinctions are inherent to the VPPA's statutory structure, *see* 18 U.S.C. § 2710(b) (limiting applicability to "video tape service provider[s]"), and these kinds of speaker-based distinctions abound in state and federal privacy law.  *See. e.g.,* Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-9 (limiting applicability to "covered entit[ies]"); Family Education and Privacy Rights Act ("FERPA"), 20 U.S.C. § 1232g(a) (limiting applicability to "educational agencies or institutions").  Thus, Defendant's preferred statutory construction would not resolve the faux constitutional issue it raises here.  Indeed, the Ninth and D.C. Circuits have rejected the notion that the VPPA offends the First Amendment.  *See IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1124 (9th Cir. 2020) (noting that statutes like the VPPA "regulate data collection and disclosure without implicating the First Amendment" (internal quotation marks omitted)); *Boehner v. McDermott*, 484 F.3d 573, 578 n.2 (D.C. Cir. 2007) (noting that disclosures may be lawfully constrained under the First Amendment, and citing the VPPA).

Third and finally, the Court notes that Defendant's approach would create its own set of constitutionally-suspect distinctions: if the Court took Defendant's view, advertising content would be exempt from the VPPA's scope, and non-advertising content would not.  This would arguably be a content-based distinction, which courts have found to be constitutionally

Therefore, the Court holds that the trailers on Peacock's website are consistent with the plain meaning of the term "video materials" in 18 U.S.C. § 2710(a)(3).

> b.  <u>List of Episodes</u>

Plaintiffs also allege that Defendant violates the VPPA prohibition against the dissemination of PII when it transmits information to the Pixel about the "lists of episodes" that subscribers may view after logging in.  (*See* CAC ¶ 43.)  Defendant argues that disclosing this information does not "identif[y] a person as having *requested or obtained specific video materials*," because a "list of available episodes" is not, without more, "specific video material" within the meaning of the statute.  (*See* Def. Mem. at 24–25.)  Plaintiff responds that disseminating information about the fact that a subscriber viewed a particular show's page is a violation of the VPPA, because it suggests that the subscriber "requested or obtained" specific video materials.  (*See* Pls. Opp. 26–27.)

The Court begins, as it must, with the plain meaning of the statute.  *See Delo v. Paul Taylor Dance Found., Inc*., 685 F. Supp. 3d 173, 180 (S.D.N.Y. 2023) (noting that "in interpreting any statute, [the court] start[s] with the plain meaning of the text").  As evidenced by the dispute between the Parties, the language of this provision is ambiguous.  "Specific video material" is a phrase capable of multiple meanings.  "Video material" could be narrowly defined to encompass nothing more than video itself, or interpreted broadly to mean anything that is "related to" video—including, as relevant here, a list containing the titles of each video. *See, e.g.*,

---

problematic.  *See Reed v. Town of Gilbert, Ariz*., 576 U.S. 155, 163 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992), and *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd*., 502 U.S. 105, 115, 118 (1991))).

*video (adjective)*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/3z9dpmrt [https://perma.cc/7EFX-WQQZ] (last visited March 24, 2025) (defining "video" (i) generally, as that which is "*relat[es] to, or concern[s]* . . . the recording, reproduction, or broadcasting of moving images" and (ii) specifically, as that which is "*[o]f* the recording, reproduction, or broadcasting of moving images") (emphasis added); *material (noun)*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/45vm7jmh [https://perma.cc/AFT2-DUDD] (last visited March 24, 2025) (defining "material" (i) generally, as "matter (not precisely characterized)" and (ii) specifically, as "[t]ext or images in printed or electronic form").

The Second Circuit has never squarely addressed the definition of "personally identifiable information." *See Salazar*, 118 F.4th at 449 n. 10 (noting that the Circuit "need not and do[es] not explore [the meaning of "personally identifiable information"] in this appeal.") Nevertheless, in *Salazar*, the court provided some guidance, suggesting that the key limitation of the VPPA's reach is found in the definition of PII: "it's the definition of 'personally identifiable information' that limits what can be shared, not the definition of 'consumer.'" *Id*. at 548. In particular, the court highlighted the "specific video materials" provision as providing a meaningful check on the scope of the VPPA, saying:

> This is not to say the VPPA's reach is boundless. As noted above, the statute only prohibits video tape service providers from "knowingly disclosing *personally identifiable information*." And the "personally identifiable information" definition "includes information which identifies a person as having requested or obtained *specific video materials or services* from a video tape service provider."

*See id*. (internal citations omitted) (emphasis in original). In coming to this conclusion, the court relied on the Senate Report accompanying the VPPA, which noted that:

> The definition of personally identifiable information includes the term 'video' to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill. For example, a department store that sells video tapes would

> be required to extend privacy protection to *only those transactions involving the*
> *purchase of video tapes* and not other products.

*See id*. at 449 n.10 (alteration adopted) (emphasis added) (citing S. REP. NO. 100-599, at 12

(1988)).  While not dispositive, the Court finds the Second Circuit's interpretation of the

restrictive role of the "personally identifiable information" provision, in tandem with the Senate

Report language on which it relies, to be persuasive authority cutting in favor of a narrower

construction than Plaintiff proposes.

Indeed, the Senate Report notes that the definition of "personally identifiable

information" is intended to be narrowly circumscribed to "specific transactions."[6]  *See* S. REP.

NO. 100-599, at 12 (1988).  At the time of the bill's enactment, the kind of "transaction"

Congress would have envisioned was one which occurred in a brick-and-mortar store.  *See*

*Eichenberger v. ESPN, Inc*., 876 F.3d 979, 985 (9th Cir. 2017) (discussing the "regime that the

VPPA's enacting Congress likely had in mind" and analogizing modern conditions to those in a

"video rental store"); *Sterk*, 770 F.3d at 625 ("[W]hen the law was passed, Congress assuredly

had a brick-and-mortar video rental store in mind."); *Feldman v. Star Tribune Media Co. LLC*,

659 F. Supp. 3d 1006, 1021 (D. Minn. 2023) (comparing the disclosure that the plaintiff alleged

to one that "might have been produced by a video-rental store in 1987").  The specific

"transactions" which occurred at brick-and-mortar stores were likely rentals and purchases.

---

[6] The Senate Report, authored by the Senate Judiciary Committee, constitutes reliable legislative history.  *See Chai v. Comm'r of Internal Revenue,* 851 F.3d 190, 219 (2d Cir. 2017) ("The most enlightening source of legislative history is generally a committee report . . . ."); *Aldana*, 2024 WL 708589, at *4 ("A committee report is the most useful document in the legislative history." (alteration adopted) (quoting *United States v. Gayle*, 342 F.3d 89, 94 (2d Cir. 2003))).

This legislative history also sheds light on the meaning of "specific video material." The "specific video material" envisioned by the Congress that enacted the VPPA, was video material susceptible to "specific transactions," like rentals and purchases. *See* S. REP. NO. 100-599, at 5 (discussing the release a list of films Judge Bork had *rented* from a video store as the impetus for the law). However, the subscriber behavior alleged by Plaintiffs—looking through a list of available episodes of a show—is less like renting or buying a video at a brick-and-mortar store, and more like browsing through a particular aisle of said store: subscribers look through a list of available titles and decide whether they then are interested in "requesting or obtaining" them. In sum, scrolling through a list of episodes is analogizable to browsing at a store, and there is no legislative history suggesting that browsing was likely to have been the kind of "specific transaction" Congress envisioned while drafting the VPPA. Thus, the Court concludes that the definition of "specific video material" put forth by Plaintiffs is likely too expansive to fall within the meaning of the statute.

*Golden* and *Aldana*, on which Plaintiff relies, are not to the contrary. In *Golden*, the court held that the plaintiff adequately alleged that the defendant disclosed personally identifiable information where the defendant shared the URL and name of videos subscribers had accessed, but not the videos themselves. *See Golden*, 688 F. Supp. at 160. The court there held that it was not material that the complaint had failed to allege whether the plaintiffs had "watched or merely access the video[s]," because the statute "was prompted by disclosure of the list of videos Judge Bork rented—not those he had viewed." *See id.* at 161. In *Golden*, unlike in the instant case, there was no question about whether the plaintiffs had accessed videos. *See id.* (describing the plaintiffs as accessing videos). The question was instead whether the plaintiffs were required to show that they had actually *watched* the videos. *See id.* ("NBCU [the defendant] has not

identified any statutory text or case authority making liability turn on whether the plaintiff whose video access was disclosed had actually watched the video(s) at issue.").

*Aldana* is a slightly more analogous case. There, the question was whether the defendant violated the VPPA where it where it had disclosed that the plaintiff had purchased a particular video game that included "cut scenes."[7]  *See* 2024 WL 708589, at *7 n.4. The defendant argued that since there could be no guarantee that the plaintiffs had in fact watched the "cut scenes" in the video game, the disclosure at issue was not covered by the VPPA. *Id.* The court held that the defendant's actions constituted disclosure of personally identifiable information because (1) the video games necessarily included cut scenes and (2) "the plain language of the VPPA regulates the disclosure of the 'title, description, or subject matter of any video tapes or other audio-visual material,'" *id.* (emphasis omitted), and at a minimum, disclosing the "name of a video game is sufficient to disclose the subject matter of the cut scenes embedded in the game," *id.* (citing 18 U.S.C. § 2710(b)(1)(D)).

Nevertheless, the facts in *Aldana* are distinguishable, because it was undisputed there that the plaintiffs had obtained or requested materials which contained video. *Id.* at *2. Here, by contrast, there is no allegation that Plaintiffs "obtained" or "requested" any materials containing a video. (*See* CAC ¶ 43.)  Instead, the CAC alleges that Defendant disclosed the fact that Plaintiffs looked at a *page* containing *descriptions* of videos. (*See* CAC ¶ 43.)  The facts in *Aldana* would be analogous had the plaintiffs alleged that defendants disclosed that the plaintiffs had looked at a *list* of video games containing cut scenes. Given that those were not the allegations, *see id.* at *1–2, *Aldana* is not on point.

---

[7] "'Cut scenes' are 'video clips within a video game' that move the narrative of the game forward."  *See Aldana*, 2024 WL 708589, at *2 n.1.

In light of the ambiguity in the statutory text, the Second Circuit's guidance on this issue, and the legislative history underpinning the provision, the Court finds that a disclosure of the fact that a subscriber looked through a list of episodes, without more, does not amount to dissemination of personally identifiable information within the meaning of the statute.

### 3. "Knowingly" Disclosing PII

Defendant also argues that Plaintiffs have not made an adequate showing that Defendant (1) disclosed Plaintiffs' PII or (2) did so knowing that it was subscriber PII. (Def. Mem. 29–31.) Defendant argues the Facebook Pixel is responsible for the disclosure of Plaintiff's PII, rather than Peacock itself. (Def. Mem. 29–31.) This argument is unavailing. The CAC alleges that Peacock knowingly "installed and implemented" the Facebook Pixel as a means of monetizing its website. (CAC ¶¶ 24–25, 28.) These "affirmative steps" are sufficient to allege that Defendant understood and intended for website users' PII to be conveyed to Facebook. *See Golden,* 688 F. Supp. at 161–62 (noting that "affirmative steps to install" the Pixel were sufficient to plead knowledge).

Despite the allegations in the CAC, Defendant nevertheless argues that there is a material distinction between "causing a disclosure" and disclosing. (See Def. Mem. 30.) This argument is in tension with the body of existing case law on this issue. In *Lee,* for example, the court rejected an argument that it was Facebook, rather than the Defendant, who disclosed the information, reasoning that:

> This is akin to knowingly setting up a video camera to record the people buying videos at your store, knowing that the camera would transmit to outside journalists. The fact that the information is provided through a tool, rather than directly, does not make the disclosure any less knowing. It cannot be argued that the tool, not the agent who installed it, is liable for the disclosure.

2025 WL 692152, at *17. In *Czarnionka v. Epoch Times Association, Inc.,* the court rejected a similar argument, noting that: "[b]y installing the Pixel, [the d]efendant opened a digital door and

invited Facebook to enter that door and extract information from within."  2022 WL 17069810,

at *3; *see also Golden*, 688 F. Supp. 3d at 161–62 (finding disclosure where the defendant had

installed a Facebook Pixel on its webpage); *Sellers v. Bleacher Rep., Inc.*, No. 23-CV-368, 2023

WL 4850180, at *5 (N.D. Cal. July 28, 2023) ("The complaint alleges that Bleacher Report

deliberately installed the Facebook pixel on its website.  It further alleges that Bleacher Report

did this in order to improve its targeted advertising and increase its revenue. These factual

allegations are enough for the court to reasonably infer that defendant knowingly discloses

personally identifying information." (internal citations omitted)); *Adams v. Am.'s Test Kitchen*,

680 F. Supp. 3d 31, 43 (D. Mass. 2023) (holding that knowledge was adequately alleged where

the defendants "'chose to install' [the] Pixel"), *appeal dismissed sub nom*. *Adams v. Am.'s Test

Kitchen, Inc.*, No. 23-1592, 2024 WL 3515257 (1st Cir. July 17, 2024).  The Court finds these

cases persuasive.  Here, Defendant is alleged to have affirmatively installed the Pixel, with full

knowledge of the fact that it sends information to Facebook.  This is enough to plead Defendant

*knowingly* disclosed subscriber information, *see, e.g., Golden*, 688 F. Supp. 3d at 162, and

Defendant cannot now argue that it was "the tool, [rather than] the agent who installed it, [who]

is liable for the disclosure," *Lee*, 2025 WL 692152, at *17.

       In sum, Plaintiffs have plausibly alleged that Defendant's behavior constitutes disclosure,

and that Defendant discloses PII with the knowledge that it belongs to subscribers.

### III.  Conclusion

       For the reasons outlined above, Defendant's Motion is granted in part and denied in part.

Although Plaintiffs' VPPA claim remains alive, they may only proceed on the claim that the

Defendant unlawfully disclosed the URLs of the trailers they viewed.

The Clerk of Court is respectfully directed to close the pending motion (Dkt. No. 33).

The Court will hold a status conference on May 8, 2025 at 10:30 A.M.

SO ORDERED.

Dated:     March 31, 2025
           White Plains, New York

_____

KENNETH M. KARAS
United States District Judge